# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

No. 12-60086

May 17, 2013

Lyle W. Cayce
Clerk

ELGIN NURSING AND REHABILITATION CENTER,

Petitioner,

versus

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

Respondent.

---

Petition for Review of a Decision of
the Department of Health and Human Services

---

Before STEWART, Chief Judge, SMITH and WIENER, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Elgin Nursing and Rehabilitation Center ("Elgin") seeks review of a final decision of the Department of Health and Human Services ("DHHS") upholding a ruling of an administrative law judge ("ALJ") affirming a determination by the Center for Medicare and Medicaid Services ("CMS") that Elgin had violated certain safety requirements by serving "undercooked" eggs to its elderly residents.

No. 12-60086

We grant the petition for review and set aside the decision.

I.

Between February 9 and 12, 2010, Elgin was investigated by the Texas Department of Aging and Disability ("TDAD"), which observed two breakfast plates with egg yolk "smeared around the plate." The surveyors interviewed residents and the kitchen manager, who confirmed that five of Elgin's residents had requested that the unpasteurized eggs that Elgin had purchased be served "soft cooked." TDAD, having concluded that "nonpasteurized shell eggs when served 'soft-cooked' . . . could lead to" serious illness and even death, found Elgin to be in noncompliance with 42 C.F.R. § 483.35(i), which requires facilities such as Elgin to serve food in a "sanitary" manner. TDAD found that Elgin's soft-cooked eggs placed its residents in "immediate jeopardy."

On March 2, 2010, CMS adopted TDAD's findings and imposed a number of penalties: a civil monetary fine of $5,000, termination of Elgin's provider-of-care agreement, a denial of payment for new admissions, and withdrawal of Elgin's approval to conduct nurse training. CMS later rescinded most of the penalties, but Elgin was still required to pay $5,000.

Elgin requested an ALJ hearing to contest the finding of a safety deficiency and the fine. It presented significant evidence in support of the safety of its culinary operations, including the affidavit of Mary Abshire, Elgin's dietary consultant, noting that she had conducted temperature checks on eggs cooked during TDAD's survey and found them to be above the required 145°F. in all instances. Elgin also presented the affidavit of Gary Jefferson, the cook who had prepared the offending meals. He described his method of cooking eggs in a half-inch of boiling oil for several minutes so that the white was congealed but the yolk was "a little soft in the middle." He added that no TDAD surveyor observed him cooking eggs, spoke with him, or took temperatures during the survey.

No. 12-60086

Pamela Sue Brummit, a registered dietician and food-safety instructor, provided an affidavit wherein she explained replicating Johnson's method. She noted that the eggs she cooked had temperatures ranging from 153 to 156°F. and that despite that, the yolks were still soft or slightly runny. Elgin attached a video of Brummit performing her experiment. CMS presented TDAD's statement of deficiencies and copies of a CMS letter and a Department of Agriculture report discussing the safe preparation of eggs. The parties agreed to all of the facts and presented no live testimony.

The ALJ found that the yolks were too soft, the whites uncongealed, and the final product not safely edible. CMS had made a *prima facie* case of noncompliance with safety regulations, and Elgin had not produced sufficient rebuttal evidence. The ALJ upheld CMS's finding of deficiency and concluded that the amount of the monetary penalty was reasonable.

On appeal to the DHHS Departmental Appeals Board, Elgin maintained again that the evidence of smeared yolk alone was not enough to make a *prima facie* case of noncompliance. The Appeals Board rejected that contention and concluded that CMS had met its burden, that substantial evidence supported the ALJ's decision, and that the fine of $5,000 was not unreasonable.

## II.

We have jurisdiction to review the decision of the Appeals Board under 42 U.S.C. § 1320a-7a(e), which provides that, upon appeal of a decision, this court may enter an order "affirming, modifying, remanding for further consideration, or setting aside, in whole or in part, the determination of the Secretary and enforcing the same." "[F]indings of the Secretary with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." *Id.* Appellate review of an agency's finding is "limited to determining whether the decision is supported by substantial evidence in the

No. 12-60086

record and whether the proper legal standards were used in evaluating the evidence." *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990). We grant deference "to the Secretary's interpretation [of the agency's regulation] unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotations omitted).

## III.

We must first determine what level of deference to give DHHS's legal interpretations. There are three levels of interpretation nested within one another. The first level is 42 C.F.R. § 483.35(i)(2), which requires that long-term care facilities "[s]tore, prepare, distribute, and serve food under sanitary conditions." That is DHHS's interpretation and implementation of 42 U.S.C. § 1320a-7j, which requires the agency to regulate nursing facilities.

That requirement in the Code of Federal Regulations ("CFR"), however, is somewhat vague—"sanitary conditions" requires further specification. Thus DHHS, through CMS, fashioned guidelines interpreting and clarifying the regulation. The second level of interpretation is CMS's interpretive manual, specifically Appendix PP of CMS's State Operations Manual ("SOM"),[1] which provides:

**Final Cooking Temperatures**

Cooking is a critical control point in preventing foodborne illness. Cooking to heat all parts of food to the temperature and for the time specified below will either kill dangerous organisms or inactivate them sufficiently so that there is little risk to the resident if the food is eaten promptly after cooking. Monitoring the food's internal tem-

---

[1] Available online at http://www.cms.gov/Regulations-and-Guidance/Guidance/-Manuals/downloads/som107ap_pp_guidelines_ltcf.pdf, at 476.

perature for 15 seconds determines when microorganisms can no longer survive and food is safe for consumption. Foods should reach the following internal temperatures:

. . .

Unpasteurized eggs when cooked to order in response to resident request and to be eaten promptly after cooking;- 145 degrees F for 15 seconds; until the white is completely set and the yolk is congealed.[2]

The third level of interpretation is CMS's interpretation, in this case, of the SOM Appendix's requirement. The SOM has its own ambiguity—there are potentially dueling requirements regarding temperature and consistency of the egg. Based on its presentations to the ALJ, the Appeals Board, and here, CMS appears to interpret the SOM as imposing a conjunctive requirement; that is, the egg must be cooked at 145°F., *and* the white must be completely congealed and the yolk firm.

CMS posits, unsurprisingly, that its interpretations at all three levels should be accorded "great deference." It contends that *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945), which mandates deference to an agency's interpretation of its own regulations, controls. Courts must, CMS asserts, defer to an agency's interpretation unless an "alternative" interpretation is "compelled" by the regulation's plain language. *Thomas Jefferson Univ.*, 512 U.S. at 512. CMS improperly mixes the last two levels of interpretation—the SOM and the SOM's later interpretation as applied to this case—into a single "interpretation" and requests *Seminole Rock* deference for the final product.

Elgin, on the other hand, urges that we may interpret the CFR regulation,

---

[2] The ALJ and Appeals Board made reference to other guidance, including Food and Drug Administration ("FDA") regulations on egg-carton labeling and a letter from CMS discussing salmonella. CMS, however, in its finding of deficiency, as well as the ALJ and Appeals Board, relied exclusively on the SOM's interpretation of the published rule.

the SOM's interpretation of the CFR, and CMS's interpretation of the SOM without reference to CMS's interpretations. Elgin points to the statement in *Kansas City Southern Industries, Inc. v. Interstate Commerce Commission*, 902 F.2d 423, 430 (5th Cir. 1990), that, "[i]n reviewing agency actions, [the court] shall decide all relevant questions of law, and interpret statutory provisions." (internal quotation omitted). That is, however, only half the standard and inapplicable here; *Kansas City Southern* reviewed agency interpretation of an originating statute, citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which is not at issue in this case.

Neither CMS nor Elgin states the proper type of deference. Nor does either analyze the correct "level" of interpretation. The first level—DHHS's interpretation and implementation of the statute promulgated in the CFR—is given *Chevron* deference.[3] The second—CMS's interpretation of the CFR as embodied in the SOM—receives *Seminole Rock* deference.[4] The question, however, is what amount of deference, if any, is accorded to CMS's interpretation *of the SOM*.[5]

An agency's interpretation of its own regulation "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Sem-*

---

[3] "If a statute is ambiguous, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

[4] *See Thomas Jefferson Univ.*, 512 U.S. at 512.

[5] In its brief, Elgin maintains that the SOM is an unreasonable interpretation of the CFR's requirement that food be prepared and served under "sanitary" conditions. Elgin bases its argument on the Texas Food Establishment Rules and the FDA Food Code, both of which focus on time-and-temperature cooking instructions and do not mention the congealment of whites or yolks. Elgin contends that, based on those, the SOM is an unreasonable interpretation of the CFR. That theory is problematic: Requiring food to be cooked with more specificity is not "inconsistent with" a regulation requiring it to be served in a sanitary way. *See Seminole Rock*, 325 U.S. at 414. The Texas and FDA rules are irrelevant.

*inole Rock*, 325 U.S. at 414. The Court reaffirmed that position in *Auer v. Robbins*, 519 U.S. 452, 461 (1997), holding that an agency's interpretation of its own regulation, published in the CFR, receives deference unless it is inconsistent with the regulation. This court "and others have held that opinion letters, handbooks and other published declarations of an agency's views, including amicus briefs, are authoritative sources of the agency's interpretation of its own regulations." *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 407–08 (5th Cir. 2010). Agencies receive even greater deference under *Seminole Rock* and *Auer* than they would under *Chevron*:

> The most important reason for extending greater deference to an *amicus* brief that purports to interpret an agency's own ambiguous regulation (under *Auer*), than a brief that interprets the organic statute directly (under *Chevron*), is the greater expertise and familiarity of the agency with respect to the history and content of its own enacted rules.

*Belt v. EmCare, Inc.*, 444 F.3d 403, 416 n.35 (5th Cir. 2006).

All of our decisions applying *Seminole Rock* and *Auer*, however, have addressed only an agency's direct interpretation of its published regulations. DHHS, it seems, asks us to go a step further and defer to its interpretation of the SOM; essentially, it seeks "*Seminole Rock* squared" deference—deferring to its interpretation of its manual interpreting its interpretive regulation. We have never granted such extraordinary deference to an agency, and we decline to do so now.

Accepting DHHS's request for such deference would lead to problematic outcomes. In the first place, it would make it possible for agencies not only to issue ambiguous regulations, but also to write and enforce ambiguous interpretations of them. It would also require courts to interpret not only interpreta-

No. 12-60086

tions, but also interpretations of interpretations.[6]

Second, granting deference to CMS's interpretation of the SOM would leave no role for the courts—taken to its logical conclusion, it could effectively insulate agency action from judicial review. It is not within the province of the Executive Branch to determine the final meaning of a vague document interpreting a regulation any more than it would be to interpret the final meaning of a contract entered into by the Executive Branch.

Third, extending *Seminole Rock* and *Auer* to apply to agency interpretations of agency interpretations of agency regulations would allow agencies to punish "wrongdoers" without first giving fair notice of the wrong to be avoided. That final concern is particularly troubling considering the monetary penalties at stake and the potential repercussions of a finding of deficiency, including, in this case, losing all access to Medicare and Medicaid reimbursement.[7]

Although there are valid reasons for allowing deference to agencies, doing so "creates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012). In *Christopher*, the Court refused to defer to an agency that had changed a long-held position in an enforcement action. Of particular concern was the lack of notice:

---

[6] Several Justices have expressed concern regarding agencies' strategically drafting vague regulations to maximize agency power and beat the "cumbersome rulemaking process." *See Thomas Jefferson Univ.*, 512 U.S. at 525 (Thomas, J., dissenting, joined by Stevens, O'Connor, and Ginsburg, JJ.). Where courts defer completely to agency interpretations of their own regulations, "the incentive is to speak vaguely and broadly, so as to retain a 'flexibility' that will enable 'clarification' with retroactive effect." *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1341 (2013) (Scalia, J., concurring in part and dissenting in part); *id.* at 1338 (Roberts, C.J., joined by Alito, J., concurring) (expressing agreement).

[7] *See Diamond Roofing Co. v. Occupational Safety & Health Review Comm'n*, 528 F.2d 645, 649 (5th Cir. 1976) ("[S]tatutes and regulations which allow monetary penalties against those who violate them . . . must give an employer fair warning of the conduct [they] prohibit[] or require[].").

No. 12-60086

> It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference.

*Id.* Allowing an agency to apply its own interpretation to an otherwise vague regulation in the context of an enforcement proceeding would unfairly surprise the sanctioned party and "seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'" *Id.* at 2167 (quoting *Gates & Fox Co. v. Occupational Safety & Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986) (alteration in original).

Affording deference to agency interpretations of ever more ambiguous regulations would allow the agency to function not only as judge, jury, and executioner but to do so while crafting new rules. "[W]hen an agency promulgates an imprecise rule, it leaves *to itself* the implementation of that rule, and thus the initial determination of the rule's meaning." *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2266 (2011) (Scalia, J., concurring). Affording deference to an agency's interpretations of its own rules "encourages the agency to enact vague rules which give it the power, in future adjudications, to do what it pleases. This frustrates the notice and predictability purposes of rulemaking, and promotes arbitrary government." *Id.* For this and the other reasons we have now explained, we do not defer to DHHS's interpretation of the SOM.

IV.

Unfettered by DHHS's interpretation of the SOM, we apply traditional tools of textual interpretation to determine its fair meaning regarding safe egg preparation. *See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508

U.S. 439, 454–55 (1993) (explaining proper statutory interpretation). We consider the text holistically, accounting for the "full text, language as well as punctuation, structure, and subject matter." *Id.* at 455.

The SOM's directive is inherently ambiguous. It states that "[f]oods should reach the following internal temperature," but its description of eggs includes "145 degrees F for 15 seconds; until the white is completely set and the yolk is congealed." There are thus two possible requisites: (1) time and temperature and (2) degree or extent of congealing. CMS's proposed interpretation treats that phrase as conjunctive—absence of either is a violation. Elgin proposes that the phrase is disjunctive—meeting either is sufficient.

The language and context of the SOM show that a disjunctive reading is the better. The punctuation between the clauses—a semicolon—tends to suggest related but separate ideas and stands for "or," not "and." Clauses separated by a semicolon "are presumed to be independent clauses." *In re Owsley*, 384 B.R. 739, 748 (Bankr. N.D. Tex. 2008); *see also McLeod v. Nagle*, 48 F.2d 189, 191 (9th Cir. 1931). That does not establish whether the clauses are conjunctive or disjunctive, however. Moreover, punctuation alone is not "a reliable guide for discovery of a statute's meaning." *U.S. Nat'l Bank of Or.*, 508 U.S. at 455.

The canon of construction that all clauses be given effect strongly recommends a disjunctive reading. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001). If the two phrases are read conjunctively, one will be rendered effectively meaningless. As was demonstrated by Brummit's video and affidavit, an egg may be cooked for 15 seconds at 145°F. but still have a runny yolk. If the regulation were read conjunctively—requiring both the stated cooking time and the prescribed level of consistency—the former requirement would be nullified; the egg would always have to be cooked until the yolk hardened, and the time

No. 12-60086

requirement would never matter.[8]

Considering the specific instructions regarding eggs in the context of the SOM Appendix as a whole also points to a disjunctive reading. The title of the relevant SOM Appendix subsection is "Final Cooking Temperatures," which suggests that the times and temperatures are the primary focus. The egg-preparation instructions are part of a list of other food-preparation instructions; for example, "Fish and other meats—145 degrees F for 15 seconds." Every other food-preparation direction includes only a temperature and time.

The fact that a consistency-and-appearance requirement is attached to eggs alone suggests that there is something different about them, and indeed there is. It is possible to take the internal temperature of meat while it is cooking and verify that it remains at that temperature for a certain period of time. An egg's temperature may also be taken if it is cooked in certain ways. It is impossible, however, to take an egg's internal temperature while it is being boiled—thus some other metric is required to ensure safe cooking.

Consistency and appearance together serve as such a proxy. Thus, an egg must be either cooked at 145°F. for 15 seconds or cooked until the white is set and the yolk congealed; either alternative is sufficient. Such a reading fits best within the context of the regulation and gives full meaning to all its parts.

## V.

Having determined the proper meaning of the SOM, we turn to Elgin's

---

[8] At oral argument, counsel for DHHS demonstrated the unworkability of its own definition: He maintained that the requirements are conjunctive, because, if an egg were left out on a counter, it would eventually congeal, meeting the second requirement. Such an egg would obviously be unsafe, so both clauses must be required. But that theory is invalid. The relevant section is titled "Final Cooking Temperatures," and the clauses complete the phrase "Foods should reach the following internal temperature." Cooking is an obvious threshold matter—the relevant question is whether the cooking must be for a certain time at a certain temperature or must lead to a congealed white and yolk.

contention that there was not substantial evidence to find that it violated the SOM. "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

Based on DHHS's interpretation of the SOM as containing a conjunctive requirement that eggs be both cooked to 145°F. for 15 seconds and have congealed whites and hard yolks, the ALJ and Appeals Board concluded that there was substantial evidence to support CMS's finding of a lack of substantial compliance.[9] There was evidence of yolks smeared on plates; only unhardened yolks could be so smeared.

Because the SOM is disjunctive, however, CMS was required to adduce evidence that eggs were not cooked at the correct temperature for the proper amount of time; absent such evidence, it could not establish that Elgin had failed to satisfy that requirement. CMS presented no evidence regarding temperature, cooking time, or cooking method of the eggs in question. No temperatures were taken during TDAD's survey, and TDAD did not observe the cooking process or communicate with the chef. CMS therefore did not present sufficient evidence to establish even a *prima facie* case of noncompliance with the time-and-temperature requirements.

DHHS may not issue ambiguous interpretive documents and then interpret those in enforcement actions—we will not defer to that level of agency interpretation. The petition for review is GRANTED, and the finding of deficiency and resultant penalties are SET ASIDE.

---

[9] DHHS defines substantial compliance as "a level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm." 42 C.F.R. § 488.301.