EDWARD C. PRADO, Circuit Judge,
concurring in part and dissenting in part:
I concur in the majority’s carefully reasoned jurisdictional analysis. But I have serious reservations about the majority’s arguments on the merits, and I must therefore respectfully dissent. The effect of the majority’s opinion is to undermine an important federal program that promotes renewable energy. The majority rejects the considered view of the federal *401 agency that authored the regulation in question and that enforces the program, based on nothing more than the state regulatory authority’s say-so. In doing so, the majority contravenes established principles of interpretation and administrative law and disrupts the scheme that Congress intended.
This case concerns the distinct roles Congress gave to federal and state regulatory authorities in Section 210 of Title II of the Public Utility Regulatory Policies Act of 1978 (“PURPA”). Pub.L. 95-617, 92 Stat. 3117, 3144. PURPA gave the Federal Energy Regulatory Commission (“FERC”) authority to promulgate rules “to encourage cogeneration and small power production” including rules that “require electric utilities to offer to ... purchase electric energy from such facilities.” 16 U.S.C. § 824a-3(a). PURPA in turn provided that “each State regulatory authority shall ... implement [any] rule [prescribed by FERC under § 824a-3(a) ].” Id. § 824a-3(f).
PURPA not only divided the tasks of regulation and implementation between federal agencies and states respectively; it also divided authority to challenge and review those implementation schemes. On one hand, PURPA makes state courts the avenue for judicial review of “any proceeding conducted by a State regulatory authority ... for purposes of implementing any requirement of a [FERC] rule.” 16 U.S.C. § 824a-3(g)(i )-(2) (cross-referencing 16 U.S.C. § 2633); 16 U.S.C. § 2633 (“Any person ... may obtain review of any determination made under [certain provisions] ... in the appropriate state court.”). On the other hand, PURPA authorizes FERC to “enforce the requirements of [the state implementation provision]” by way of “an action against the state regulatory authority ... for failure to comply” with the implementation requirements. Id. § 824a-3(h)(2)(A). In addition, PURPA entitles electric utilities and small power producers to petition FERC “to enforce the requirements of [the state implementation provision].” Id. § 824a-3(h)(2)(B). If FERC declines to use its enforcement authority within sixty days, “the petitioner may bring an action in the appropriate United States district court to require such State regulatory authority ... to comply with [the implementation] requirements,” and FERC may intervene as of right. Id.
These interlocking components of PURPA — ordering FERC to prescribe rules, giving state regulatory authorities control over implementation of those rules, and empowering FERC to enforce state compliance with the FERC rules — provide the framework for this dispute. Here, FERC mandated that “[e]ach qualifying facility[1] shall have the option ... to provide energy or capacity pursuant to a legally enforceable obligation.” 18 C.F.R. § 292.304(d)(2). The Public Utility Commission of Texas (“PUC”) implemented that regulation by permitting only some qualifying facilities to enter into a legally enforceable obligation. 16 Tex. Admin. Code § 25.242(c) (“PUC Rule 25.242”). In response to Appellees’ (collectively, “Exe-lon”) petition for enforcement, FERC issued a declaratory order (“Declaratory Order”) finding that the PUC failed to implement its rule: “we find that ... the requirement in Texas law that legally enforceable obligations are only available to sellers of ‘firm power,’ as defined by Texas law, [is] inconsistent with PURPA and our regulations implementing PURPA, particularly section 292.304(d) of our regu *402 lations.” JD Wind 1, LLC, 129 FERC ¶ 61,148 (Nov. 19, 2009).
The majority diverges from the detailed reasoning of the district court, which, like FERC, had found that the PUC had failed to implement the regulation. In doing so, the majority departs from the plain language of the regulation, which mandates that every qualifying facility shall have the option to form legally enforceable obligations. PUC Rule 25.242 deprives qualifying facilities of that option and therefore is inconsistent with the regulation. Even if the regulation did not plainly bar the PUC’s regulation, the majority also errs by refusing to defer to the FERC’s expert interpretation of its own regulation.
I. DISCUSSION
We review a district court’s interpretation of a federal regulation de novo. The starting point for our court’s analysis is to apply standard interpretive principles to determine whether FERC (in its rule) or Congress (in PURPA) have spoken directly to the precise issue in question. See Talk Am., Inc. v. Mich. Bell Tel. Co., — U.S. —, 131 S.Ct. 2254, 2260, 180 L.Ed.2d 96 (2011) (first analyzing whether a “statute or regulation squarely addresses” the issue in that case); Chase Bank USA N.A. v. McCoy, 562 U.S. 195, 131 S.Ct. 871, 878, 178 L.Ed.2d 716 (2011) (same); cf. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (asking at the first step “whether Congress has directly spoken to the precise question at issue” or whether the statute is ambiguous). To ascertain whether the regulation has spoken unambiguously to the question at issue, the court “avail[s itself] of the traditional means of statutory interpretation, which include the text itself, its history, and its purpose.” See Bellum v. PCE Constructors, Inc., 407 F.3d 734, 739 (5th Cir.2005) (citing Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004)).
If the regulation is silent or ambiguous — that is, it does not answer the precise question at issue — after using ordinary tools of statutory interpretation, our court then must confront a difficult issue of deference doctrine: where Congress has given important roles to both a federal agency and state regulatory authorities, and those federal and state agencies offer conflicting interpretations of the federal regulation, to which agency, if any, should we defer?[2] We typically defer to a federal agency’s reasonable interpretation of its own regulation. But the Appellants and the majority assume that the discretion afforded state regulatory authorities in implementing the regulation suggests that they deserve the deference, not FERC.
As I explain below, we ought to give FERC deference because FERC is the author of the regulation at issue and the structure of PURPA suggests Congress’s intent to let FERC’s interpretations of its own regulation trump the state’s. Yet, to be sure, we do not need to reach this question of deference because the regulation’s plain language bars the PUC’s interpretation.
II. “STEP ONE”
PURPA required FERC to promulgate rules that “require electric utilities to offer *403 to ... purchase electric energy from such facilities.” 16 U.S.C. § 824a-3(a). The statute did not do any more to describe the regulatory scheme that would give effect to this mandatory purchase provision, leaving FERC to work out the details. FERC, pursuant to its delegated authority, issued the following regulation:
Each qualifying facility shall have the option either:
(1) To provide energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility’s avoided costs calculated at the time of delivery; or
(2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:
(i) The avoided costs calculated at the time of delivery; or
(ii) The avoided costs calculated at the time the obligation is incurred.
18 C.F.R. § 292.304(d).
A. All Qualifying Facilities Are Entitled to Create Legally Enforceable Obligations.
The key phrase in dispute is “Each qualifying facility shall have the option ... [t]o provide energy ... pursuant to a legally enforceable obligation.” The majority looks at that phrase and concludes that “the plain text of the FERC regulation fails to mandate that all Qualifying Facilities be allowed to form legally enforceable obligations.” Majority op. at 397 (citation and internal quotation marks omitted). I strongly disagree.
FERC spoke “in terms of the mandatory ‘shall,’ which normally creates an obligation impervious to judicial discretion.” Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 27, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998); see, e.g., Nat'l Ass’n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 661-62, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (language in the Clean Water Act that EPA “shall approve” an application was mandatory and removed EPA’s discretion not to approve the applications); Black’s Law Dictionary 1375 (9th ed.2009) (noting that it is the “mandatory sense [of ‘shall’] that drafters typically intend and that courts typically uphold”). The majority points to no argument that would alter this presumption of a mandate.
The terms of this mandate require the state regulatory authority to preserve an option belonging to each qualifying facility to form a legally enforceable obligation. The option belongs to each qualifying facility, which means that it belongs to “every” qualifying facility. See Sierra Club v. EPA 536 F.3d 673, 678 (D.C.Cir.2008) (“ ‘Each’ means ‘[e]very one of a group considered individually.’ ” (quoting American Heritage Dictionary 269 (4th ed.2001))). Every qualifying facility “ha[s]” the option; not the state regulatory authority. Thus, the state regulatory authority may not make the choice for each qualifying facility. See 45 Fed.Reg. 12,214, 12,224 (1980) (“The Commission intends that rates for purchases be based, at the option of the qualifying facility, on either the avoided costs at the time of delivery or the avoided costs calculated at the time the obligation is incurred.” (emphasis added)).
Additionally, the option guarantees the ability to form a legally enforceable obligation. The term “legally enforceable obligation” is scarcely defined, and the ma *404 jority assumes that this ambiguity means that the regulation does not precisely answer the question at issue. But this ambiguity does not alter in any way the regulation’s mandate. Whatever the term “legally enforceable obligation” might mean is irrelevant, so long as each qualifying facility has the option to form one. From this fact we can also infer that any definition of “legally enforceable obligation” that undermines the mandate is not permitted. So, since Qualifying facilities may include wind power producers, see 18 C.F.R. § 292.204(a)-(b) (covering small power producers whose primary energy source is renewable resources, including wind), and the PUC Rule defines “legally enforceable obligation” so that those producers cannot claim that entitlement, the PUC’s definition of “legally enforceable obligation” violates the clear mandate. If FERC had intended categorically to limit the mandatory option, it would not have used terms such as “each” and “shall.”
B. The PUC Firm-Power Rule Makes Some Qualifying Facilities Ineligible to Form Legally Enforceable Obligations.
As the majority states, “the PUC’s rule implementing FERC’s Regulation permits only a Qualifying Facility that generates ‘firm power’ to enter into a Legally Enforceable Obligation.” Majority op. at 385 (citing PUC Rule 25.242). That alone should be enough to conclude that the PUC rule “fail[s] to comply” with the implementation requirements imposed on it by PURPA. See 16 U.S.C. § 824a-8(f), (h)(2)(A). Because the mandatory option is the linchpin of the regulation and the PUC Rule categorically bars some qualifying facilities from exercising their mandated option, I would conclude that the PUC regulation conflicts with the unambiguous terms of the regulation.
The majority says that “there is no FERC Regulation or PURPA provision specifically addressing whether non-firm energy providers may form Legally Enforceable Obligations.” Majority op. at 395. But this reading overlooks the term “each,” which plainly means any and every qualifying facility. Since every qualifying facility may form legally enforceable obligations, the regulation does not need to specify which qualifying facilities, be they firm or non-firm, may form them. It would be an illogical and inconsistent result, then, to read “each” as meaning only “firm-power.”
Finally, our interpretation of the regulation should give effect to the purposes of the statute. Congress identified a problem: electric utilities were monopsonies, lone buyers of energy in a market with many potential producers of energy, and “traditional electricity utilities were reluctant to purchase power from ... nontraditional facilities.” FERC v. Mississippi 456 U.S. 742, 750, 102 S.Ct. 2126, 72 L.Ed.2d 532 (1982). Congress sketched out a bold solution to that problem — mandatory purchases of energy by electrical utilities from qualifying facilities, 16 U.S.C. § 824a-3(a) — and asked FERC to promulgate rules to that effect. FERC chose a scheme that turned on making legally enforceable obligations available for each qualifying facility. In fact, FERC recognized that to encourage that sort of energy production, the regulations had to provide the certainty that comes with having a long-term obligation. Thus, FERC invoked “the need for qualifying facilities to be able to enter into contractual commitments” and “the need for certainty with regard to return on investment in new technologies” that only those long-term legally enforceable obligations could provide. 45 Fed.Reg. at 12,224. Giving only some of the qualified facilities the leverage to *405 overcome the uncompetitive monopsonies would undermine this basic purpose. It will provide no investment certainty, and, inevitably, many developers will be unable to produce energy using the new technologies that PURPA sought to encourage.
The majority appears to endorse the view that a contrary purpose of the statute should prevail: “the congressional intent that rates under PURPA ‘shall be just and reasonable to the electric consumers of the electric utility and in the public interest.’ ” Majority op. at 400 (quoting 16 U.S.C. § 824a-3(a)(2), (b)(1)). But none of the Appellants brings a challenge to FERC’s regulation implementing PURPA, and if there were any ambiguity about FERC’s consideration of those views, FERC has made a permissible interpretation of the general statutory command. See Chevron, 467 U.S. at 843, 104 S.Ct. 2778. Indeed, FERC addressed the majority’s concerns for just and reasonable rates through an entirely different scheme in its regulation. FERC used the concept of “avoided costs” to simultaneously provide nondiscriminatory pricing to the new market entrants, the small energy producers, but also accord with market rates for electricity. See 18 C.F.R. § 292.304(a), (c) (setting guidelines for state avoided-cost rate-setting); 45 Fed.Reg. 12,222 (“The Commission has ... provided that the rate for purchases meets the statutory requirements [for just and reasonable rates] if it equals avoided costs.”).
The idea that the court can read FERC’s regulation as violating the terms of the statute — but for the saving interpretation that Occidental offers — runs contrary to the Chevron canon. It is inappropriate for the court to assert that “[b]ecause only firm power Qualifying Facilities can provide that kind of [cost] certainty, it makes sense that only they should be able to select between the rate options.” Majority op. at 400. It may “make[ ] sense” to us lay judges, though I tend to think not. But it makes as much sense to do as FERC has done — namely, to provide every qualifying facility with the option to enter into a legally enforceable obligation and trust that “in the long run, ‘overestimations’ and ‘underestimations’ of avoided costs will balance out.” 45 Fed Reg. 12,224. The point is, though, that it really is not for a court to say. Congress delegated the authority to weigh these considerations to an expert agency. Only by displacing FERC’s role as Congress’s delegatee and going beyond the issue in dispute can the court offer its merely plausible reading of statutory language and conclude that FERC is doing it wrong.
III. “STEP ZERO”
Supposing that we could get past the mandatory language of the statute, I would still find that the district court properly adopted FERC’s view of its own regulation. The majority would have us upset this basic doctrine of agency deference because the PUC enjoys some discretion in implementing FERC regulations. The majority’s conclusion that the PUC acted within its discretion to answer the supposedly ambiguous question in this case lacks foundation. But it is worth first examining the hard issue of first impression this case actually creates and why, nevertheless, deference to FERC makes sense.
A. The Court Should Defer to FERC’s Interpretation of Its Own Regulation, Even Under PURPA’s Cooperative Federalism Scheme.
It is well-established that a federal agency’s interpretation of its own regulation “ ‘becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.’ ” Elgin Nursing & *406 Rehab. Ctr. v. U.S. Dep’t of Health & Human Servs., 718 F.3d 488, 492 (5th Cir.2013) (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)); see also Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). Indeed, Seminole Rock and Auer dictate deference to the federal agency’s interpretation of its own regulation even when that agency’s interpretation is made informally. Elgin Nursing, 718 F.3d at 493 (“This court and others have held that opinion letters, handbooks and other published declarations of an agency’s views, including ami-cus briefs, are authoritative sources of the agency’s interpretation of its own regulations.” (citations and internal quotation marks omitted)). Therefore, if 18 C.F.R. § 292.304(d) really were ambiguous, FERC’s interpretation of that regulation in its 2009 Declaratory Order would ordinarily control our court’s interpretation “unless it is plainly erroneous or inconsistent with the regulation.”
If a statute entitles two agencies to take administrative actions based on promulgated regulations under the statute and those agencies come to conflicting interpretations of the regulation, we must ask a prior question: To which agency did the statute give “the power to render authoritative interpretations of [the] regulations”? Martin v. Occupational Safety & Health Review Comm’n, 499 U.S. 144, 152, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991). To answer that question, courts must “infer from the structure and history of the statute” which agency should be the primary interpreter of the regulations.[3] Id.
In Martin, the court examined the split-enforcement scheme Congress created under the Occupational Safety and Health Act (“OSH Act”). The OSH Act entrusted the Secretary of Labor with “responsibility for setting and enforcing workplace health and safety standards,” but delegated authority the Occupational Safety and Health Review Commission to adjudicate disputes, including employer challenges to the Secretary’s enforcement actions. See id. at 147-48, 111 S.Ct. 1171 (citing 29 U.S.C. §§ 651(b)(3), 658-661, 665, and 666). If the Commission ruled against the Secretary, the Secretary had “the right to seek review of [the] order in the court of appeals.” Id. at 148, 111 S.Ct. 1171.
Faced with an appeal in which the Commission and the Secretary offered conflicting interpretations of an OSH Act regulation, the Martin Court held that the Secretary deserved the deference. Id. at 152, 111 S.Ct. 1171. The Court placed *407 heavy emphasis on the fact that the Secretary — as the head of the agency that promulgates the standards — was “in a better position than ... the Commission to reconstruct the purpose of the regulations in question.” Id. In addition, the Court found that “by virtue of the Secretary’s statutory role as enforcer, the Secretary comes into contact with a much greater number of regulatory problems than does the Commission,” which adjudicated episodically based only on contested enforcement actions. Id. Thus, the Court concluded that the Secretary should enjoy primary interpretive authority due to the agency’s “historical familiarity and policy-making expertise,” id. at 152, 111 S.Ct. 1171, and courts “should defer to the Secretary [to the extent] the Secretary’s interpretation is reasonable,” id. at 158, 111 S.Ct. 1171 (emphasis omitted).
Martin’s statute-specific analysis should guide our analysis of the deference dilemma here. Like the delegation to the Secretary under the OSH Act, PURPA placed FERC in charge of writing rules and enforcing them. See 16 U.S.C. § 824a-3(a), (h)(1). In particular, 16 U.S.C. § 824a-3(h) (“Commission enforcement”) empowered FERC to “enforce the requirements of [the state implementation provision]” when a state has “fail[ed] to comply” with the implementation requirements. See id. § 824a-3(h)(2).[4]
Congress apparently did not just want FERC to provide its views on its regulation through enforcement actions; PURPA also confers on FERC an entitlement to intervene as of right in a petitioner’s federal court action even when FERC did not use its discretionary enforcement power. Id. State regulatory authorities have no analogous role to either the Commission or the Secretary in Martin. Whereas the Commission in Martin had the power to hear and decide cases brought against the Secretary, a state regulatory authority enjoys no equivalent adjudicative authority. Instead, state regulatory authorities have a unique mandate to implement the FERC regulations through their own chosen state mechanisms. See FERC v. Mississippi, 456 U.S. at 760, 102 S.Ct. 2126; see also 16 U.S.C. § 824a-3(f). In addition, state regulatory authorities may defend as-applied challenges to their implementation plans in state court actions, but, under federal law, they enjoy neither a special adjudicative or enforcement power. See 16 U.S.C. § 824a-3(g).
This scheme strongly indicates that “the power to render authoritative interpretations of [PURPA] regulations is a ‘necessary adjunct’ of [FERC’s] powers to promulgate and to enforce national ... standards.” See Martin, 499 U.S. at 152, 111 S.Ct. 1171. FERC is the author of the regulations it is asked to interpret and enforce, and FERC is thus in a “better position than” the PUC to say what those regulations mean. Id. We have said before that this authorship rationale is “[t]he most important reason for extend *408 ing greater deference” to an agency’s informal interpretation of its own regulation under the Auer doctrine. Belt v. EmCare, Inc., 444 F.3d 403, 416 n. 35 (5th Cir.2006). Nothing about PURPA’s cooperative federalism scheme detracts from this crucial reason for deference to the promulgating agency.
The layered design of the enforcement provisions further points to FERC’s leading interpretive role. Although PURPA specifically provided a special implementation role for state regulatory authorities, PURPA gave FERC a trump card when it permitted FERC to bring enforcement actions against state regulatory authorities that had “fail[ed] to comply” with FERC regulations. It would be odd indeed for Congress to give FERC the power to bring enforcement actions against state regulatory authorities, only to let FERC lose every action because Congress had supposedly intended states, not FERC, to have interpretive authority. Such an outcome would nullify FERC’s enforcement power and upset the “multi-layered enforcement” scheme PURPA devised. Congress appears to have intended for FERC’s interpretation, not the PUC’s, to have the upper hand. Here, that means we should give controlling weight to FERC’s reasonable interpretation of its own regulation.
What mitigates the effect of this FERC trump for the PUC is the latitude that FERC has granted state agencies “in determining the manner of implementation of [FERC’s] rules, provided that the manner chosen is reasonably designed to implement the requirements of [18 C.F.R. §§ 292.301-14].” 45 Fed.Reg. at 12,230-31. FERC did so with a sense that states could use discretion to implement better policies. FERC noted the context of “economic and regulatory circumstances [that] vary from State to State and utility to utility” and “recogni[zed] the work already begun and ... the variety of local conditions.” Id. at 12,231. The Supreme Court ratified that “latitude” language in FERC v. Mississippi, 456 U.S. at 751, 102 S.Ct. 2126. Congress also expected meaningful interaction between state regulatory authorities and FERC, since PURPA instructed FERC to consult with state regulatory authorities before issuing regulations. See 16 U.S.C. § 824a-3(a) (“Such rules shall be prescribed, after consultation with representatives of Federal and State regulatory agencies having ratemak-ing authority for electric utilities, and after public notice and a reasonable opportunity for interested persons (including State and Federal agencies) to submit oral as well as written data, views, and arguments.”).
In light of FERC’s stated position, our court has previously said that “[w]e review the PUC’s implementation with deference because ‘[a] state has broad authority to implement PURPA with respect to the approval of purchase contracts between utilities and QFs.’ ” Power Resource III, 422 F.3d at 236 (quoting N. Am. Natural Res., Inc. v. Mich. Pub. Serv. Comm’n, 73 F.Supp.2d 804, 807 (D.Mich.1999)). Or, as we summarized it elsewhere, the state regulatory authorities exercise their discretion in “setting the specific parameters” on when and how legally enforceable obligations may be formed. Id. at 238 (citing FERC declaratory orders that permitted state discretion in defining parameters of legally enforceable obligations); id. at 239 (referring to the discretion that “FERC has given” state regulatory authorities).
This discretion is limited, though, and, in any case, it tells us little about which agency Congress wanted to speak with the force of law. Generally, implementation discretion is limited by the requirement that the chosen means of implementation *409 are “reasonably designed to give effect to FERC’s rules.” FERC v. Mississippi, 456 U.S. at 751, 102 S.Ct. 2126. In addition, in some cases, PURPA gave exclusive control to FERC to implement some rules. In Power Resource III, for example, the court acknowledged that PURPA gave an exclusive grant of authority to FERC over rules on the certification of qualifying facilities. 422 F.3d at 236 n. 2.; see also Indep. Energy Prods. Ass’n, Inc. v. Cal. Pub. Utils. Comm’n, 36 F.3d 848, 853-54 (9th Cir.1994) (“The structure of PURPA and [FERC]’s regulations[ ] reflect Congress’s express intent that [FERC] exercise exclusive authority over QF status determinations.”).
B. The Majority’s Reasons Do Not Support Deferring to the PUC.
I am unconvinced by the majority’s reasons for deferring to the PUC’s interpretation of the FERC regulations.
1. No FERC Interpretation
The majority opines that there is no FERC interpretation to interpret in this case. Not so. First, while the majority opinion correctly notes that FERC is not a party and did not take a position before our court, the fact that FERC is not a party makes no difference. In fact, courts regularly grant deference to nonparty ami-ci. See, e.g., Decker v. Nw. Envtl. Def. Ctr., — U.S. —, 133 S.Ct. 1326, 1336-37, 185 L.Ed.2d 447 (2013) (giving Auer deference to the EPA’s interpretation offered in an amicus brief). In any case, the FERC interpretation is “before our court” not only because its Declaratory Order is in the record and has been briefed by the parties, but also because FERC’s Declaratory Order was the jurisdictional prerequisite for the case even coming to our court. See Power Resource III, 422 F.3d at 235 (“If FERC does not bring an enforcement action within 60 days following the date on which a petition is filed, the utility or qualifying facility may bring an enforcement action in federal district court.” (quoting 16 U.S.C. 824a-3(h)(2)(B))).
Also note that if the court required that the interpretation be argued by a party “before our court,” we would actually lack a PUC interpretation, too. Before our court, the PUC has notably abandoned the interpretation of the FERC regulation that it made in the district court, instead relying entirely on the now-repudiated argument that our court lacks jurisdiction. It would seem a double standard for the majority to rely on this argument to negate FERC’s interpretation while preserving the PUC’s.
Second, the majority acknowledges that FERC offered its interpretation in its Declaratory Order, but minimizes the effect of that interpretation by characterizing it as a “single letter”[5] sent to Exelon. This misunderstands the situation. FERC made its Declaratory Order pursuant to its regulatory authority. See supra n. 4. FERC published notice of Exelon’s predecessor’s filing in the Federal Register, inviting interventions and protests. See JD Wind 1, LLC, et al.; Notice for Petition for Declaratory Order, 74 Fed.Reg. 51147-02 (Oct. 5, 2009). FERC received briefing from the Appellants in that proceeding, and also from a variety of other industry groups, renewable energy developers, and utilities. See JD Wind 1, LLC, 129 FERC ¶ 61,148, at ¶ 61,630-32. Many of these intervenors were under the impression that FERC’s interpretation was not just a one-off missive intended for a single party, but a wide-ranging policy interpretation. *410 See, e.g., id. at ¶ 61,631. (“Montana Re-newables states that the Texas Commission’s interpretation of when legally enforceable obligations can be established will negatively affect all intermittent resource QFs in the United States.”). Then, FERC published its interpretation in a public reporter, available for all state regulatory authorities and regulated parties to consult. JD Wind 1, LLC, 129 FERC 61,148 (Nov. 19, 2009). There is only a single letter because that is how authoritative interpretations are often made.
2. Power Resource III
Power Resource III does not support the majority’s holding. Two important limitations make that case inapplicable here. First, Power Resource III’s statement of deference was highly context-specific. This case is different. Second, that case tells us nothing about which agency deserves deference where FERC has spoken and disagrees with a state agency’s interpretation of FERC’s regulations.
FERC’s grant of discretion to the PUC was necessarily tied to the particular issue in the case — conditions on the formation of legally enforceable obligations. Every indication shows that the Power Resource III court was careful not to overstate the scope of the PUC’s discretion. Its crucial statement of deference, which the majority recites, accords deference only “with respect to the approval of purchase contracts between utilities and QFs.”[6] The district court thoroughly discredited reliance on Power Resource III in its opinion below:
In Power Resource [III], the Fifth Circuit considered whether [the PUC]’s ninety-day rule was a valid implementation of PURPA. The ninety-day rule simply limits when in time a LEO can be created; no LEO can be established more than ninety days before the QF has power available, or will have power available. After careful analysis, and noting the discretion afforded the States in determine when a LEO is formed, the Fifth Circuit upheld the rule. [422 F.3d] at 240.... Unlike the firm-power rule, any wind QF can comply with the ninety-day rule; it is simply a matter of timing. Although there are no doubt considerable practical expenses and difficulties involved, in theory any QF can comply with the ninety-day rule through careful planning in advance, such as in what sequence to seek financing, obtain permitting, and begin different phases of construction, in relation to when to send LEO paperwork to a utility.... By contrast, the firm-power rule is simply insurmountable for an entire class of QFs. No sequence of permitting, financing, and construction will magically transform the vagaries of the wind into the constant, predictable stream of energy demanded by the firm-power rule. As such, this case falls outside the scope of guidance offered by Power Resource [III].

Put another way, Power Resource [III] reviewed [a] rule [] governing when and how a LEO is formed, whereas the firm-power rule ... determines] whether some types of QF can ever obtain a LEO.

Exelon Wind 1, LLC v. Smitherman, 2012 WL 4465607, at *12 (W.D.Tex.2012) (emphasis added). The difference between that case and this one is one of kind, not degree.
*411 The next difference between this case and Power Resource III is just as remarkable and legally significant. In Power Resource III, FERC did not offer its interpretation of its own regulation in response to the petitioner’s request. Power Resource III, 422 F.3d at 234 (describing that “[a]fter FERC had not acted on [Power Resource Group]’s petition for 60 days, [Power Resource Group] filed a complaint”). Still, Power Resource III looked to (and was persuaded by) FERC declaratory orders in determining whether it was appropriate to grant discretion to the PUC:
West Penn [Power Co., 71 F.E.R.C. ¶ 61153, 61,495 (May 8, 1995),] and its progeny Jersey Central Power & Light Co., 73 F.E.R.C. ¶ 61,092, 61,297 (Oct. 17, 1995), and Metropolitan Edison Co., 72 F.E.R.C. ¶ 61,015, 61,050 (July 6, 1995), support the proposition that the FERC regulations grant the states discretion in setting specific parameters for LEOs.
Id. at 238. In other words, “FERC has given each state the authority to decide when a LEO arises in that state.” Id. at 239 (emphasis added). Therefore, Power Resource III does not stand for unalloyed deference to the state regulatory authority in interpreting FERC’s regulations. At best, it stands for deference to the state regulatory authority when FERC has taken no action and has previously announced that it will leave an ambiguous provision to the state agencies to interpret. FERC has offered a contrary interpretation to the PUC here, and so Power Resource III cannot control.
Still, Power Resource III is entirely consonant with the Martin analysis laid out above. The Power Resource III court made its deference determination contingent on whether Congress and FERC intended for the state to make an authoritative interpretation and whether the state acted within the scope of that delegation. In particular, Power Resource III considered the structure of the statute, see id. at 236 n. 2, and FERC’s own position that defining the parameters of LEO formation was within the state’s discretion, id. at 238. Based on those considerations, the court necessarily concluded that the state had been assigned the role of chief implementer and chief interpreter of those particular rules. Adopting the “Step Zero”-like Martin framework merely makes explicit our underlying considerations of Power Resource III, and it explains why this ease is different.
3. Brand X
In rejecting Auer deference for FERC’s Declaratory Order, the majority invokes the Brand X doctrine even though it is inapposite. See Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 980-86, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). That case held that “[a] court’s prior construction of a statute trumps an agency construction otherwise entitled to Chevron deference only if the prior court decision held that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.” Id. at 982, 125 S.Ct. 2688. The majority then asserts that Power Resource Ill’s “prior reading of FERC’s Regulation unambiguously forecloses the interpretation offered by FERC.” Majority op. at 397. I disagree. As discussed above, Power Resource III answered a different question, so even if that case did offer an unambiguous interpretation of the regulation, that interpretation would not bind us.
In addition, as Power Resource III states in a portion quoted in the majority opinion, “[t]he plain text of the FERC regulation ... fails to mandate [the] re *412 quirement [that Power Resource Group sought].” 422 F.3d at 239. In other words, Power Resource III determined that the plain text of the FERC regulation is silent or at least ambiguous on the issue in question. That means quite plainly that Power Resource III’s interpretation of the regulation cannot bar FERC’s later interpretation.
In fact, the majority flips Brand X on its head in concluding that a prior judicial construction, which held that the regulation is ambiguous, can be used as a bar against deferring to a later agency construction. Brand X establishes the opposite holding: it ensures that a later agency construction of an ambiguous statute or regulation is entitled to deference in spite of a prior judicial opinion that interpreted the ambiguous provision a different way. Here, the majority in effect punishes FERC for failing to defend its (purportedly identical) position in a prior case, but as Brand X said, “[ajgency inconsistency is not a basis for declining to analyze the agency’s interpretation.” Brand X, 545 U.S. at 981, 125 S.Ct. 2688. Ultimately, the majority’s point boils down to simply saying that a prior opinion of this court deferred to the PUC in implementing an ambiguous regulation.
4. Superfluity Engendered by FERC’s Interpretation
The next reason the majority gives for its refusal to defer to FERC is that “the reading advocated by [FERC and] Exelon would render PURPA subsection (d)(1) superfluous.” Majority op. at 399. The superfluity argument goes as follows: if (d)(2) does give an advantage by permitting a qualifying facility to get as-available prices but also an ability to lock in a buyer for a period of time, then no qualifying facility would choose the (d)(1) route. The majority says this reading makes (d)(1) superfluous because it is “hard to understand why” FERC chose this bifurcated scheme for electricity sales. Id. at 399. But the difficulty of understanding dynamic, complex, and technical fields is not a reason to presume superfluity.
Fundamentally, the opinion conflates the desirability of the (d)(2) option with its necessity. That is, although forming a legally enforceable obligation is desirable, that option is not always practically available, in which case (d)(1) provides a complementary or second-best scheme for qualifying facilities. Thanks in part to rules like the one our court affirmed in Power Resource III, a legally enforceable obligation can be harder to form. Consequently, selling power without a legally enforceable obligation can save those formation costs. In the event that a qualifying facility begins producing energy but is barred for ninety days from forming a legally enforceable obligation, (d)(1) would allow the qualifying facility to begin selling its energy without waiting for the formation of the legally enforceable obligation. So, even admitting my ignorance of the intricacies of electricity markets, I still can confidently say that (d)(1) would not be superfluous merely because (d)(2) is also an available option for qualifying facilities.[7]
5. Concession by Counsel
Finally, the majority concludes that it should not apply Auer deference to the Declaratory Order because Exelon’s counsel conceded the point at oral argument. Simply put, it is our job, not counsel’s, to interpret the regulation correctly and to determine whether deference to an agency is appropriate, so counsel’s concession is of no legal moment.
*413 The majority points to no case in which such a concession has mattered, and based on my research, the concessions of parties — either challenging or acceding to Auer deference — have never had the weight that the majority places on Exe-lon’s concession. In Elgin Nursing & Rehabilitation Center, this court noted that the party challenging a Department of Labor interpretation of its own informal regulatory document had conceded that the DOL would enjoy Auer deference over a reasonable interpretation. 718 F.3d at 492 n. 5. But instead of relying on that concession, the Elgin court concluded that the DOL interpretation was not entitled to Auer deference because the interpretation was of an informal regulatory document. Id. at 493; see also Castellanos-Contreras v. Decatur Hotels, LLC, 622 F.3d 393, 401 n. 8 (5th Cir.2010) (en banc) (noting a concession by the agency as to deference but relying on other grounds for rejecting Auer deference).
In sum, the majority does not provide a good reason to refuse to give controlling weight to FERC’s interpretation of its own regulation. The majority’s deference analysis rests on five grounds: (1) the absence of a FERC interpretation; (2) an application of Power Resource III; (3) an extension of Brand X analysis; (4) a superfluity argument; and (5) the concession of Exe-lon’s counsel.[8] As I explain above, these grounds do not give good reason to offset the strong basis our court has for deferring to FERC. Therefore, assuming the regulation is ambiguous on the question at issue here, I believe the better approach would be to defer to FERC’s reasonable interpretation of its own regulation, as stated in its Declaratory Order.
IV. CONCLUSION
The majority’s opinion does not persuade me that the regulation is ambiguous or that we should not defer to FERC. Using standard tools of interpretation to uncover the FERC regulation’s plain meaning, I conclude that the PUC rule conflicts on its face with the FERC regulation. Even if the regulation were ambiguous, I would conclude that our court should defer to FERC’s reasonable interpretation of that regulation according to well-established principles of administrative deference. I fear that the majority’s approach will not only prevent the realization of the goals that Congress identified when it passed PURPA; it also sets a far-reaching precedent, with the potential to impact how we review the numerous federal programs that seek to obtain the benefits of both state and federal participation. See, e.g., AT & T Corp. v. Iowa Util. Bd., 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (holding that the Federal Communications Commission, not a state agency, had authority to interpret a provision of the Telecommunications Act of 1996); Alaska Dep’t of Envtl. Conservation v. E.P.A., 540 U.S. 461, 502, 124 S.Ct. 983, 157 L.Ed.2d 967 (2004) (holding that the EPA could overrule the state agency’s construction of the term “best available control technology” in the Clean Air Act”). For these reasons, I concur in part and respectfully dissent in part to the majority’s opinion.

. That is, each cogenerator and small power producer that FERC finds meets certain operating and efficiency standards under 18 C.F.R. §§ 292.203-07.

. As one scholar recently observed, "State implementation of federal law is commonplace, but has been largely ignored by the interpretive doctrines of legislation and administrative law.” See Abbe R. Gluck, Intras-tatutory Federalism and Statutory Interpretation: State Implementation of Federal Law in Health Reform and Beyond, 121 Yale L.J. 534, 534 (2011).

. The Martin test parallels the Supreme Court's Chevron "Step Zero” analysis, which asks whether Congress delegated authority to make interpretations carrying the force of law. See United States v. Mead, 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); see also Gluck, supra, at 599 (“An extension of Mead, or something like it, to include state implementers — that is, to take into account the specific ways that Congress utilizes state implementers to determine the level of deference the various concurrent implementers should receive — may not be a radically different approach than the one currently in use.”); Jacob E. Gersen, Overlapping and Underlapping Jurisdiction in Administrative Law, 2006 Sup.Ct. Rev. 201, 219, 223-24 (stating that deference questions in a statute administered by multiple agencies is "best treated as a Step Zero inquiry” and discussing Martin as an illustration of that inquiry). Under that analysis, courts determine where to place a single agency’s interpretation of a statute along a spectrum of deference. See Mead, 533 U.S. at 236-37, 121 S.Ct. 2164. Courts look for that “[djelegation of [interpretive] authority ... in a variety of ways, as by an agency’s power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.” Id. at 227, 121 S.Ct. 2164. The analysis, then, is attentive to the structure and text of each specific statute.

. In addition, although Martin did not require it, we might expect to only give deference to an agency interpretation when it colors inside the boundaries Congress gave it — i.e., when it is within the scope of its delegation. Mead, 533 U.S. at 227, 121 S.Ct. 2164. With regard to its enforcement powers, FERC has reasonably interpreted its enforcement power to include the ability "to terminate a controversy or remove uncertainty” through the use of declaratory orders. 18 C.F.R. § 385.207(a) (interpreting enforcement authority under the Federal Power Act); see 16 U.S.C. § 824a-3(h)(2)(A) (directing FERC to enforce state implementation of its rules as a "rule enforceable under the Federal Power Act”). Therefore, FERC’s Declaratory Order is a valid exercise of FERC’s enforcement powers under the theory that the greater enforcement power necessarily includes the lesser authority to issue declaratory orders.

. The "letter” that FERC sent Exelon is also known as a "Declaratory Order” — the preferred nomenclature. See, e.g., Indus. Cogenerators v. FERC, 47 F.3d 1231 (D.C.Cir.1995).

. Even this statement of limited deference is somewhat confusing. The deference applies to conditions on the formation of both contracts and legally enforceable obligations, which are emphatically not contracts.

. The majority acknowledges that this is a satisfactory explanation for (d)(1). See Majority op. at 399 n. 17.

. The majority also rejects Auer deference to FERC on the ground that it occasions a “shift in power [that] might raise ... 'troublesome' Tenth Amendment concerns.” Majority op. at 396 n. 13. The majority does not elaborate on what those constitutional concerns might be, so it is impossible for me to respond to the majority's statement. In any case, the majority does not rely on this constitutional avoidance argument for its deference holding.