# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

October 24, 2018

Lyle W. Cayce
Clerk

No. 17-60736

WORLDCALL INTERCONNECT, INCORPORATED, also known as Evolve Broadband, Complainant,

      Petitioner

v.

FEDERAL COMMUNICATIONS COMMISSION; UNITED STATES OF AMERICA,

      Respondents

AT&T MOBILITY, L.L.C.,

      Intervenor

On Petition for Review of an Order of the
Federal Communications Commission

Before KING, ELROD, and HAYNES, Circuit Judges.*

KING, Circuit Judge:

Worldcall Interconnect, Inc., petitions this court for review of the FCC's order denying its application for review. Worldcall filed a complaint with the FCC after it and AT&T Mobility, L.L.C., were unsuccessful in negotiating

---

* Judge Elrod concurs in the judgment only.

terms for a roaming agreement. In its complaint, Worldcall alleged that AT&T had proposed terms that violated the FCC's roaming rules and refused to accept terms that complied with these rules. The FCC's Enforcement Bureau found that AT&T's proposed rates did not violate its roaming rules. Worldcall sought review of the Bureau's order from the FCC, which denied its application. Worldcall now petitions this court for review. We DENY the application.

## I.

### A.

The concept of roaming is familiar to the average cellphone user. What the average cellphone user, or even the average lawyer, is likely unfamiliar with is the complex regulatory framework that underlies the use and provision of those services. This case concerns that framework.

A roaming transaction consists of three parties: the subscriber (i.e., the cellphone user), the host provider, and the home provider. The subscriber purchases wireless service from the home provider. When traveling outside of the home provider's network area, the subscriber uses the host provider's network infrastructure to receive mobile services. For this to be possible, the home provider and host provider must enter into an agreement granting the home provider's subscribers use of the host provider's network.

The Federal Communications Commission (the "Commission") regulates roaming services. The Communications Act of 1934 (the "Act"), 47 U.S.C. §§ 151-624, empowers the Commission to regulate wire and radio communication in the United States, including roaming services.

The Commission's regulation of roaming services reaches back to the early 1980s, *see Cellco P'ship v. FCC*, 700 F.3d 534, 538 (D.C. Cir. 2012) (citing *An Inquiry Into the Use of the Bands 825-845 MHz & 870-890 MHz for Cellular Commc'ns Sys. and Amendment of Parts 2 & 22 of the Comm'n's Rules Relative*

*to Cellular Commc'ns Sys.*, 86 F.C.C.2d 469, 502 (1981)), but only two comparatively recent regulatory developments require discussion here. The first came in 2007, when the Commission issued an order concerning automatic roaming. *Reexamination of Roaming Obligations of Commercial Mobile Radio Serv. Providers*, 22 FCC Rcd. 15817, 15818 (2007) ("Automatic Roaming Order"). In the Automatic Roaming Order, the Commission defined automatic roaming as a service with which "a roaming subscriber is able to originate or terminate a call in the host carrier's service area without taking any special actions." *Id.* app. A at 15850 (amending 47 C.F.R. § 20.3). Automatic roaming is defined in contrast to manual roaming, which requires special action on the part of the subscriber—typically providing a credit card number to the carrier—before the other network can be used. *Id.* The Automatic Roaming Order provided that host carriers must provide automatic roaming "upon reasonable request" and "on reasonable and nondiscriminatory terms and conditions." *Id.* app. A at 15851 (amending 47 C.F.R. § 20.12). The order cabins the application of this obligation, however, to (1) "CMRS [commercial mobile radio service] carriers" who "offer real-time, two-way switched voice or data service that is interconnected with the public switched network" and (2) "the provision of push-to-talk and text-messaging service by CMRS carriers." *Id.* CMRS had been previously defined under 47 C.F.R. § 20.3 as "a mobile service that is: (a)(1) Provided for profit, i.e., with the intent of receiving compensation or monetary gain; (2) An interconnected service; and (3) Available to the public, or to such classes of eligible users as to be effectively available to a substantial portion of the public; or (b) The functional equivalent of such a mobile service."

Importantly, the Automatic Roaming Order expressly did not extend to noninterconnected data services, including Mobile Broadband Internet Access Services ("MBIAS"). Automatic Roaming Order, 22 FCC Rcd. at 15839. Responding to increases in the use of noninterconnected data services and the

difficulty of small providers in obtaining roaming agreements from larger carriers, the Commission promulgated the Data Roaming Order in 2011. 26 FCC Rcd. 5411, 5416 (2011) ("Data Roaming Order"). The Data Roaming Order applied to "all facilities-based providers of commercial mobile data services [CMDS]," *id.* app. A at 5458 (amending § 20.12), and defined CMDS as "any mobile data service that is not interconnected with the public switched network and is: (1) provided for profit; and (2) available to the public or to such classes of eligible users as to be effectively available to the public." *Id.* app. A at 5457 (amending § 20.3). Under the Data Roaming Order, providers of CMDS are required to "offer roaming arrangements to other such providers on commercially reasonable terms and conditions," subject to limitations. *Id.* app. A at 5458 (amending § 20.12). The only limitation relevant here is the understanding that "providers may negotiate the terms of their roaming arrangements on an individualized basis." *Id.* The Commission assesses commercial reasonableness on a "case-by-case" basis, considering the "totality of the circumstances." *Id.* In the Data Roaming Order, the Commission set forth a non-exhaustive list of factors it may consider in making this determination. *Id.* at 5452-53.

CMDS providers' ability to individually negotiate under the Data Roaming Order creates a critical distinction between that order and the Automatic Roaming Order. Under the Auto Roaming Order, discrimination in terms is not permissible; under the Data Roaming Order, it is. *See Cellco P'ship*, 700 F.3d at 548. This is because the Commission did not intend to subject CMDS providers to what are known as common carriage obligations (discussed below). *See id.* at 545. Indeed, the D.C. Circuit upheld the Data Roaming Order on the basis that it did not subject CMDS providers to common carriage obligations, as this would have likely exceeded the Commission's authority under the Act. *See id.* at 545.

The Commission promulgated the Automatic Roaming and Data Roaming Rules under Titles II and III of the Communications Act, respectively. Title II of the Act grants the Commission power to regulate "common carrier services." Title III grants the commission power to regulate radio communications. Common carrier services regulated under Title II must be furnished "upon reasonable request," 47 U.S.C. § 201(a), on "just and reasonable" terms, § 201(b), and without "unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services." § 202(a).

Although Title II's definition of "common carrier" is circular, *see id.* § 153(11) (defining "common carrier" as "any person engaged as a common carrier for hire"), Title III clarifies which mobile services should be treated as a common carriage and which should not. Section 332(c)(1)(A) directs the Commission to treat anyone providing "commercial mobile service," insofar as it is providing that service, as a common carrier, excepting such classes as the Commission may prescribe. In turn, § 332(d)(1) defines "commercial mobile service" as "any mobile service . . . that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the commission," and § 332(d)(2) defines "interconnected services" as a "service that is interconnected with the public switched network (as such terms are defined by regulation by the commission) or service for which a request for interconnection is pending." Any mobile service that is not a commercial mobile service or its functional equivalent is designated a "private mobile service." *Id.* § 332(d)(3). Insofar as a person is providing private mobile service, it may not be treated as a common carrier. *Id.* § 332(c)(2). Thus, if a service is not interconnected with the public switched

5

network, it is a private mobile service and therefore not subject to common carriage obligations.

To recap, the resulting regulatory regime divides the world of roaming—for our purposes, at least—into CMRS and CMDS. CMRS includes interconnected voice or data services, as well as text and push-to-talk.[1] Providers of CMRS services are subject to common carrier obligations and are not allowed to discriminate in the terms they offer. CMDS includes all for-profit, publicly-available, noninterconnected data services. Providers of CMDS services are required only to provide roaming agreements on commercially reasonable terms; they can discriminate in the terms they offer.

## B.

Worldcall Interconnect, Inc. ("WCX"), is a mobile services provider licensed to operate in the primarily rural triangle between Houston, Austin, and San Antonio. When WCX's users travel outside of that triangle, they cannot access WCX's network using WCX's infrastructure alone. As a result, WCX had to seek out another mobile services provider, or providers, with a broader network that WCX users could use while outside of WCX's service area.

In 2011, WCX approached AT&T seeking a data roaming agreement. In order to understand the terms of the agreement, some explanation of the mechanics of roaming on the particular AT&T network at issue here is necessary. When a WCX subscriber uses AT&T's network, the AT&T core network verifies that the subscriber is authorized to roam on the network and then forwards the data transmission to WCX's network for further routing. The

---

[1] We acknowledge that push-to-talk and text are not included in the regulatory definition of CMRS. However, because the Automatic Roaming Order subjects those services to the same requirements as CMRS (namely, Title II common carrier requirements), we will use CMRS as a blanket term for all three services for ease of reading.

parties agree that the AT&T infrastructure that would be used by WCX subscribers for roaming is not interconnected. The WCX network that the subscriber will be forwarded to, however, offers both interconnected and noninterconnected services. Once on WCX's network, the subscriber can browse the internet (noninterconnected), originate and terminate calls (interconnected), and send texts (interconnected). When a subscriber is roaming, the AT&T network cannot distinguish between the various services the subscriber may be utilizing.

After several months of unsuccessful negotiations, the parties went to the Commission seeking assistance in reaching a compromise. After another few months, WCX sought to file a complaint on the Commission's accelerated docket but was denied.

The parties resumed negotiations in 2014, but these negotiations also stalled. In September 2014, WCX filed its initial complaint with the Commission. The complaint alleged several violations of federal communications law and Commission regulations. Relevant here, WCX alleged that AT&T's proposed rates were unreasonably discriminatory, seeking application of the Automatic Roaming Rule to its dispute. Alternatively, WCX alleged that the rates were commercially unreasonable under the Data Roaming Rule.

After WCX filed its complaint, the Enforcement Bureau staff directed WCX and AT&T to exchange their best and final offers. When the parties failed to resolve their dispute, the Bureau issued an interim order denying WCX's complaint. In doing so, the Bureau determined that the Data Roaming Rule would apply to the dispute and found that AT&T's proposed rates were not commercially unreasonable. After the interim order was issued, AT&T and WCX executed a roaming agreement that "resolve[d] the remaining issues consistent with the *Interim Order*." The parties entered this agreement with

the understanding that WCX would challenge the order on a motion for reconsideration with the Commission. The Bureau adopted the interim order, and WCX sought review from the full Commission.

The Commission denied WCX's petition for review. Agreeing with the Bureau, the Commission determined that § 20.12(e) (the Data Roaming Rule), and not § 20.12(d) (the Automatic Roaming Rule), should apply to the dispute before it. The Commission held that, as between the two provisions, which provision applies depends on the type of service the host carrier will be supplying in the given transaction. When the host carrier supplies only noninterconnected data services, the Data Roaming Rule applies; when the host carrier supplies interconnected voice, push-to-talk, or text services, the Automatic Roaming Rule applies. The Commission then made the finding that WCX requested use of "AT&T's mobile broadband internet access service." Because MBIAS is a noninterconnected data service, the Commission determined that the Data Roaming Rule applied.

Applying the Data Roaming Rule, the Commission found that WCX had failed to demonstrate that AT&T's proposed rates were commercially unreasonable. The Commission based this conclusion on a review of AT&T's other data roaming agreements, which contained rates that were comparable to, and in some cases higher than, those offered to WCX. It also affirmed the Bureau's decision not to accord significant weight to pieces of evidence proffered by WCX, including AT&T's strategic agreements and WCX's roaming agreement with another provider, finding they were not useful proxies for the commercial reasonableness of AT&T's data roaming rates. The Commission therefore denied WCX's application for review. WCX now petitions this court for review. AT&T joins in this appeal as an intervenor.

## II.

## A.

We review agency action under the Administrative Procedure Act's arbitrary and capricious standard. *See* 5 U.S.C. § 706(2)(A). Arbitrary and capricious review asks "whether [the] agency articulated a rational connection between the facts found and the decision made." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 571 (5th Cir. 2017) (quoting *Pension Benefit Guar. Corp v. Wilson N. Jones Mem'l Hosp.*, 374 F.3d 362, 366 (5th Cir. 2004)). Under this standard of review, the Commission's factual findings must be supported by "substantial evidence." § 706(2)(E); 47 U.S.C. § 402(g). Substantial evidence involves "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Human Servs.*, 718 F.3d 488, 495 (5th Cir. 2013) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). On questions of law, we accord deference to an agency's interpretation of its own ambiguous regulation. *See Tex. Clinical Labs v. Sebelius*, 612 F.3d 771, 777 (5th Cir. 2010) ("Generally, an agency's interpretation of its own ambiguous regulation is 'controlling' unless 'plainly erroneous or inconsistent with the regulation.'" (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (2010))). This deference is "even greater" than the deference agencies receive under *Chevron, U.S.A., Inc v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), when interpreting statutes they are tasked with enforcing. *Elgin Nursing*, 718 F.3d at 493.

## B.

WCX contends that the Automatic Roaming Rule should apply to this dispute. It first argues that (1) the Commission erred in finding that WCX had requested "Mobile Broadband Internet Access Service" ("MBIAS"), rather than a roaming agreement, and (2) the Commission reached the conclusion that the

Data Roaming Rule should apply on the basis of that erroneous factual finding. According to WCX, it simply requested a "roaming agreement," not MBIAS. In response, the Commission and AT&T argue that the Commission's finding was proper, pointing out that WCX alleged a violation of § 20.12(e) in its initial complaint and conceded that the rule applies to MBIAS.

Not one of the three parties to this dispute marshals sufficient record evidence on this point. Despite WCX's allegation that it sought only a roaming agreement, it does not cite to the terms of its best and final offer, nor the terms of any other potential agreement between it or AT&T, as evidence of its seeking a "roaming agreement." On the other side, the Commission and AT&T try to establish that WCX sought MBIAS based on WCX's own representations in the course of this proceeding. These representations fall far short of substantiating the Commission's finding that "WCX requests only a mobile broadband Internet access service from AT&T." True, WCX did allege a violation of § 20.12(e), but it also alleged a violation of § 20.12(d), and has consistently maintained that it has sought both automatic and data roaming for its customers. It may well be the case that the service sought by WCX was in fact only MBIAS, but WCX's admissions alone will not establish that.

We need not wade into this inadequately briefed factual quibble, however. We may assume without deciding that the Commission erred in its determination that WCX requested MBIAS. Such a finding alone does not warrant vacatur unless the alleged error was prejudicial. In conducting arbitrary and capricious review, the APA requires that courts take "due account . . . of the rule of prejudicial error." § 706. Under this doctrine, also referred to as harmless error, we will not reverse an agency action due to a mistake where that mistake "clearly had no bearing on the procedure used or the substance of decision reached." *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001) (quoting *U.S. Steel Corp. v. EPA*, 595 F.2d

207, 215 (5th Cir. 1979)).[2] This inquiry is informed by several factors. *See City of Arlington v. FCC*, 668 F.3d 229, 244 (5th Cir. 2012) (citing *Shinseki v. Sanders*, 556 U.S. 396, 411-12 (2009)). The only such factor relevant here is "an estimation of the likelihood that the result would have been different." *Id.* (quoting *Shinseki*, 556 U.S. at 411).[3]

Appearing to anticipate this requirement, WCX avers in its reply brief that the Commission's allegedly erroneous finding "was the foundation for [its] legal conclusion that only Rule 20.12(e) applies." We are not so sure. While WCX is correct that the Commission referenced WCX's requesting MBIAS "*four times*," the references appear unimportant when viewed in context. As discussed, the Commission reached its conclusion that § 20.12(e) applied by interpreting § 20.12(d) to only apply insofar as the host carrier was engaged in the provision of CMRS. "These, and these alone," the Commission wrote, "are the 'services covered by' Section 20.12(d)." To be sure, this sentence is followed by the controverted "WCX requests only a mobile broadband Internet access service from AT&T." However, in light of the preceding statement, the references to MBIAS would only have prejudicial significance if there were any possibility that the Commission might have otherwise found that AT&T was providing, or that WCX had requested, interconnected services *supplied by AT&T*. This is because the interpretation adopted in the Order on Review makes the applicable rule turn on what service is being supplied by the *host* provider, in this case AT&T. WCX has conceded that AT&T did not offer it interconnected services (i.e., CMRS). Accordingly, it would have made no

---

[2] This language dates back to the Supreme Court's decision in *Mass. Trs. of E. Gas & Fuel Assocs. v. United States*, 377 U.S. 235, 248 (1964).

[3] The other suggested factors are an awareness of what body has the authority to reach the challenged result, the error's likely effects on the perceived integrity of judicial proceedings, and a hesitancy to generalize about particular errors where the specific facts surrounding the error may make all the difference. *Id.*

difference whether the Commission had found that WCX had requested MBIAS, roaming access, or any other noninterconnected service; so long as it did not find that AT&T-supplied interconnection was involved, it had a valid basis for concluding that § 20.12(d) did not apply.[4] It follows from this that § 20.12(e) would apply; the parties do not dispute that WCX sought a "data service" of some variety,[5] and the bifurcated nature of the Commission definitions subjects publicly-available for-profit data services to § 20.12(e) insofar as they are not interconnected. *See* § 20.12(e).[6] We therefore conclude that any alleged error that the Commission may have made in stating that WCX requested MBIAS was harmless and therefore does not warrant vacatur.

## C.

We turn next to WCX's proposed interpretation of § 20.12. According to WCX, § 20.12(d), the Automatic Roaming Rule, should apply to this dispute. To this end, WCX proffers what it calls a "who-what" interpretation of the rule. Under this interpretation, §§ 20.12(a)(2) and (a)(3) supply the "who"— namely the parties that are subject to the automatic and data roaming obligations, respectively—and §§ 20.12(d) and (e) supply the "what"—i.e., the requirements imposed on those parties. Under this interpretation, AT&T is a § 20.12(a)(2) "who" because it supplies interconnected services to its retail customers, and it is therefore subject to the § 20.12(d) "what," namely the obligation to provide

---

[4] Of course, this does not address the question of whether the Commission's interpretation of § 20.12 was correct, which we discuss below.

[5] At every stage of this litigation, AT&T and WCX have agreed that any agreement would involve the use of AT&T's LTE network. The agreement sought was also characterized before the Commission as a "data roaming agreement." As discussed above, WCX also admits that AT&T will not supply interconnection.

[6] WCX does dispute, however, whether AT&T's services fall within the definition of CMDS, because they are not "available to the public." This contention is meritless. Roaming, by its nature, involves a home provider's subscriber using the host provider's infrastructure for wireless services. *See Cellco P'ship*, 700 F.3d at 537. When AT&T offers data roaming to WCX, it is offering data services to the public. AT&T's noninterconnected data services therefore meet the regulatory definition of CMDS.

automatic roaming upon reasonable request. Because WCX contends it requested automatic roaming in this case, it insists the Automatic Roaming Rule applies.

The Commission first argues that this argument is not properly before us. According to the Commission, WCX raises its "who-what" interpretation of § 20.12 for the first time on appeal. Because the Commission has not had the opportunity to consider it, the Commission contends, this court may not be the first to pass on its merits.

WCX offers a retort in a brief footnote in its reply brief. Responding not only to this waiver argument, but to the Commission's other waiver arguments (made in its commercial reasonableness section, discussed below), WCX contends that "these assertions rest on mischaracterizations of WCX's arguments or ignore that WCX's Brief is merely 'the same basic argument in a more polished and imaginative form.'" Pet'r Reply Br. 8 n.2 (quoting *Sw. Bell. Tel. Co. v. FCC*, 100 F.3d 1004, 1007-08 (D.C. Cir. 1996))

The Communications Act provides that the filing of a petition for reconsideration is a condition precedent to judicial review where the party seeking review "relies on questions of fact or law upon which the Commission . . . has been afforded no opportunity to pass." 47 U.S.C. § 405(a). This does not "require an argument to be brought up with specificity, but only reasonably 'flagged' for the agency's consideration." *NTCH, Inc. v. FCC*, 841 F.3d 497, 508 (D.C. Cir. 2016) (quoting *Time Warner Entm't Co. v. FCC*, 144 F.3d 75, 81 (D.C. Cir. 1998)). The central question is "whether a reasonable Commission necessarily would have seen the question raised before us as part of the case presented to it." *Id.* (quoting *Time Warner*, 144 F.3d at 81).

In order to determine whether WCX raises this argument for the first time on appeal, we must determine precisely what argument WCX raises on appeal and what argument WCX raised before the Commission. Before the

Commission, WCX appears to have argued that because its subscribers utilize *its* interconnected network to make calls while roaming on AT&T's network, § 20.12(d) should apply. Here, as discussed, WCX appears to emphasize not what its subscribers do, but what AT&T does, to bolster its conclusion that § 20.12(d) applies.

We find that WCX adequately preserved this argument before the Commission. Although WCX did not raise its "who-what" argument with specificity, the record below contains references to this general line of argument. WCX stated in its application for review that "AT&T offers interconnected voice and data service to its own customers, so it is subject to 20.12(d)." It also made a similar point in its reply brief before the Commission. While there may not be exact congruity between the two arguments, this was sufficient to "tee[] up" the issue before the Commission, *Time Warner*, 144 F.3d at 81, such that it was aware that the issue of the proper interpretation of § 20.12 was before it. *See Fibertower Spectrum Holdings, LLC v. FCC*, 782 F.3d 692, 697 (D.C. Cir 2015) (finding waiver where petitioner "has not pointed to record evidence that the Commission realized [petitioner's argument] was before it"). Moreover, the Commission had an opportunity to pass on the precise legal question raised by WCX—the proper interpretation of § 20.12—there and on appeal. Accordingly, WCX's § 20.12 arguments have not been waived.

We turn now to the merits of WCX's § 20.12 argument. When an agency interprets its own ambiguous regulation, we apply *Auer* deference, striking down only agency interpretations that are "plainly erroneous or inconsistent with the regulation." *Auer*, 519 U.S. at 461 (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)). WCX contends that the text of § 20.12 is "clear and unambiguous and cannot yield to the Commission's reading" and therefore does not warrant *Auer* deference. It also contends that

in any event the reading does not sensibly conform to the regulation's purpose and wording, and therefore fails even under the deferential *Auer* standard.

A review of the text of § 20.12 leads to the conclusion that the regulation is, at the very least, ambiguous. Subsection (a)(2) (the "who" section of the regulation, according to WCX) provides that automatic roaming obligations apply to "CMRS carriers if such carriers offer real-time, two-way switched voice or data service that is interconnected with the public switched network and utilizes an in-network switching facility that enables the carrier to re-use frequencies and accomplish seamless hand-offs of subscriber calls" as well as "the provision of push-to-talk and text-messaging service by CMRS carriers." Even assuming that this section provides the "who," and section (d) provides the "what," neither section expressly provides the "when." Consider the word "offer" under (a)(2). The regulation does not specify whether the Automatic Roaming Rule applies when the host provider "offers" interconnected services to its retail customers, or only when it "offers" such services to roaming customers. Nor does the language of section (d) fill this gap in the regulatory scheme. It can therefore scarcely be said that the text is "clear and unambiguous." Accordingly, *Auer* deference applies.

Mindful of our deferential standard of review, we conclude the Commission's interpretation—that it is the service being supplied by the host carrier, rather than the home carrier, that determines whether the Automatic Roaming Rule applies—is permissible. This interpretation finds support in the text of the Federal Communications Act, as well as the discussion from both Roaming Orders. First, the statutory provision that imposes common carrier obligations on providers of mobile services states that

> a person engaged in the provision of a service that is a commercial mobile service shall, *insofar as such person is so engaged,* be treated as a common carrier for purposes of this chapter, except for

15

such provisions of subchapter II as the Commission may specify by regulation as inapplicable to that service or person.

47 U.S.C. § 332(c)(1)(A) (emphasis added). The discussion section of the Automatic Roaming Order makes this point even more saliently: "Like any other common carrier service offering, if a *CMRS provider* offers automatic roaming, it triggers its common carrier obligations *with respect to the provisioning of that service.*" Automatic Roaming Order, 22 FCC Rcd. at 15827-28 (emphasis added). Third, the Data Roaming Order contains language that would seem to bolster the Commission's interpretation, or at the very least foreclose WCX's:

> Under our decision today, as long as a provider provides mobile data services that are for profit and available to the public or to such classes of eligible users as to be effectively available to the public, it will be covered by the rule adopted herein *regardless of whether the provider also provides any CMRS* and without regard to the mobile technology it is utilizing to provide services.

Data Roaming Order, 26 FCC Rcd. at 5432 (emphasis added). These sources more than justify the Commission's conclusion that AT&T is only subject to automatic roaming obligations when it is supplying CMRS.

The balance of the parties' briefing concerns the potential consequences that will follow from the adoption of one another's respective interpretations. But we see no need to delve into those matters, given our highly-limited scope of review. The foregoing is sufficient to establish that the regulation was at the very least ambiguous and that the Commission's interpretation was not "plainly erroneous or inconsistent with" § 20.12. With *Auer* in mind, our inquiry into the meaning of § 20.12 is at its end.

The question that remains is whether AT&T is providing CMRS or CMDS in this case. As discussed, the parties agree that AT&T is not supplying interconnection. Accordingly, the service it provides does not fall within the

definition of CMRS, and the Automatic Roaming Rule does not apply. On the other side of the coin, there is ample evidence that the service at issue here is CMDS. First, parties agree that WCX approached AT&T seeking a data roaming agreement. Second, the roaming rates proposed by both parties related to measurements used to price data usage. Additionally, the timing of the agreement is evidence of its character. In their joint statement before the Bureau, the parties acknowledged that WCX sought a "data roaming agreement" "shortly after the *Data Roaming Order* was released." The foregoing makes clear that WCX sought and AT&T offered to provide AT&T-supplied CMDS. The Commission therefore did not act arbitrarily or capriciously in concluding that the Data Roaming Rule applies to this dispute.

**D.**

Because we affirm the Commission's application of the Data Roaming Rule, we must now determine whether the Commission's determination of the commercial reasonableness of the rates was in error under the highly deferential standard of review discussed above. WCX argues that, even if the Data Roaming Rule applies, the Commission erred in finding that AT&T's rates were commercially reasonable. The Data Roaming Rule requires CMDS providers to enter into data roaming agreements on commercially reasonable terms. § 20.12(e). The Commission assesses commercial reasonableness on a case-by-case basis based on the totality of the circumstances. *See* § 20.12(e)(2). The Data Roaming Order also provides a non-exhaustive list of factors the Commission may consider in making its determination. Data Roaming Order, 26 FCC Rcd. at 5452-53. These factors include, inter alia:

> [W]hether the terms and conditions offered by the host provider are so unreasonable as to be tantamount to a refusal to offer a data roaming arrangement . . . the level of competitive harm in a given market and the benefits to consumers . . . the impact of the terms and conditions on the incentives for either provider to invest in

> facilities and coverage, services, and service quality . . . [and] whether there are other options for securing a data roaming arrangement in the areas subject to negotiations and whether alternative data roaming partners are available.

*Id.* We review the subsidiary factual findings made in the Commission's commercial reasonableness determination for substantial evidence under the APA's arbitrary and capricious standard. 5 U.S.C. § 706(2)(E); 47 U.S.C. § 402(g).

WCX first contends that the Commission erred by failing to take into account WCX's individual ability to compete. In particular, WCX emphasizes that AT&T's proposed rates are in excess of what WCX can charge its retail customers under Texas law. As a result, if WCX accepts AT&T's rates, it will have to either restrict users' access to roaming or operate at a considerable loss.

The Commission contends that this argument is not properly before the court. As discussed above, the filing of a petition for reconsideration is a condition precedent to judicial review where the petitioner seeks to raise a new question of fact or law. 47 U.S.C. § 405(a). Additionally, "raising an issue before a designated authority is not enough to preserve it for review before [the] Court; a party must raise the issue before the Commission as a whole." *Environmentel, LLC v. FCC*, 661 F.3d 80, 84 (D.C. Cir. 2011). The Commission argues that WCX's petition below failed to charge the Bureau with failing to consider WCX's individual ability to compete. While WCX did raise a version of this argument in its briefing before the Bureau, the Bureau rejected the argument in a footnote, and WCX did not raise it in its petition before the Commission.

We find that WCX failed to preserve this argument. Although WCX alludes to its individual ability to compete at various points in its petition for

review and reply below, it did so only in the context of arguing that the Bureau erred by "holding that WCX failed to demonstrate that AT&T's proposed rates substantially exceed retail rates." A review of the record confirms that WCX's assertion of competitive harm was a gloss on its argument that AT&T's proposed fees were severely in excess of its retail rates; not a concern to be considered by the Commission in and of itself. We also note the lack of any reference to the Texas retail caps in WCX's petition for review before the Commission. Given the caps' centrality to WCX's argument on appeal, the Commission deserved an opportunity to consider this constraint, especially if—as WCX contends—the question of WCX's individual ability to compete were before it. As a result, we cannot say that the Commission had an opportunity to pass on WCX's argument that its individual ability to compete should be considered. This argument is therefore not properly before us, and we cannot consider it.

WCX next argues that the Commission erred by failing to consider its roaming agreement with another wireless provider as evidence of the commercial unreasonableness of AT&T's rates. To support its argument, WCX points to the Data Roaming Order's admonition that the Commission should consider "alternative data roaming partners" in making its determination of commercial reasonableness. Data Roaming Order, 26 FCC Rcd. at 5453.

In its interim order, the Bureau refused to give the partner's rates significant weight. It reached this conclusion on the grounds that (1) the Data Roaming Order contemplates that providers may "negotiate terms and conditions on an individualized basis, including prices, with different parties" and (2) WCX's admission that AT&T's network coverage was superior to its alternative partner. The Commission did not discuss this claim on review but instead adopted the Bureau's order.

WCX takes issue with the second basis for the Bureau's conclusion. Although it is true that AT&T offers a superior product, WCX argues that this cannot function as a justification for higher prices. According to WCX, it was the superiority of AT&T's network coverage, along with its attendant unwillingness to enter into reasonable data roaming agreements, that created the necessity for a Data Roaming Order. If the mere fact that AT&T has a more extensive network than most other potential roaming partners is sufficient to sustain a finding of commercial reasonableness, then, WCX contends, there will be little difference between the state of play prior to and after the Data Roaming Order was issued.

In response, the Commission argues that there is nothing unreasonable about charging more for a superior product. In the Commission's view, this outcome is consistent with one of the Data Roaming Order's other purposes, which is to "accommodate a variety of terms and conditions" and "allow[] host providers to control the terms and conditions of proffered data roaming arrangements, within a general requirement of commercial reasonableness." Data Roaming Order, FCC Rcd. at 5429, 5451.

We cannot say that the Bureau and Commission acted arbitrarily and capriciously in reaching this conclusion. WCX is correct that AT&T's unwillingness to enter data roaming agreements was part of the mischief that prompted the Commission's promulgation of the Data Roaming Order. *See id.* at 5424. However, the Data Roaming Order tasks the Commission with balancing competing interests in assessing commercial reasonableness. On one side, the Commission must ensure smaller providers' ability to enter into roaming agreements with the larger providers. *See id.* On the other, it must allow the providers to negotiate individualized terms for those agreements. *Id.* This is reflected not just in the Data Roaming Order's discussion, but in the broad leeway the resulting regulation accords the Commission to conduct the

commercial reasonableness inquiry. *See* § 20.12(e)(2) (requiring case-by-case analysis based on a totality of the circumstances). Weighing these interests, the Bureau (and the Commission, by adopting its order) determined that the commercial reasonableness standard did not compel it to tie AT&T's rates to those of a company that offered an inferior product.

WCX next argues that, by excluding its proffered evidence, the Commission based its determination exclusively on the data roaming rates offered by AT&T to other customers. This scope, WCX contends, effectively defines the relevant market to include AT&T alone. Under this arrangement, WCX and other small providers have no real choice but to "accept AT&T's adhesion offer." Similar to its previous argument, WCX argues that this contravenes the Data Roaming Order's purpose of promoting competition in the market.

We find that Bureau's analysis did not define the relevant market to include only AT&T. The Bureau did consider the other rates, but simply found that they do not, of their own weight, call into question the commercial reasonableness of AT&T's proposed rates. Refusing to give substantial weight to the evidence of alternative rates is not the same as excluding the evidence altogether. Moreover, while it may be true, as WCX contends, that the current market forces WCX to choose between a more expensive product and an inferior product, this does not mean that it has been left with no choice at all. If WCX wishes, it can offer its customers a network with a smaller coverage area for lower prices. Although that may strike WCX as inconsistent with the purposes of the Data Roaming Order, those are matters best addressed by the Commission. As we have already said, the Order tasks the Commission with weighing competing goals, and our review of the agency's interpretation of the Order is heavily cabined.

WCX also objects to the weight accorded to AT&T's other roaming agreements as evidence of the commercial reasonableness of AT&T's proposed rates. According to WCX, the providers who accepted the prices cited to were "loudly advising the Commission" that they had accepted these prices under duress and that they had to exit the market because of the prices they had accepted. The upshot of WCX's argument appears to be that, while many of these prices were higher than the price offered to WCX, they too are commercially unreasonable and are therefore not probative of the reasonableness of AT&T's proposed rates.

We find that WCX did not raise this argument in its petition for review. While WCX did attack consideration of these rates in its petition for review below, it did so on the grounds that the rates considered were AT&T's oldest and most expensive agreements.[7] Nowhere in its petition for review did WCX contend that those rates were accepted under duress. Therefore, this argument is not properly before this court.

Viewing the Commission's consideration of the evidence as a whole, WCX contends that the Commission created an irrebuttable presumption in favor of the commercial reasonableness of AT&T's proposed rates and that it therefore ran afoul of § 20.12(e)(2)'s requirement that it consider reasonableness on a "case-by-case basis, taking into consideration the totality of the circumstances presented in each case." As a result, WCX contends, the interpretation of the commercial reasonableness standard does not deserve *Auer* deference.

We disagree. As discussed above, the record makes clear that the Commission considered both AT&T's and WCX's proffered evidence, balanced the competing interests embodied by the Data Roaming Order, and reached a

---

[7] WCX does not brief its argument that the rates provided by AT&T were its oldest and most expensive. Accordingly, we treat that argument as waived on appeal. *See In re Age Ref., Inc.*, 801 F.3d 530, 539 & n.23 (5th Cir. 2015); *see also* Fed. R. App. P. 28(a)(8).

reasoned conclusion. That it found AT&T's proposed evidence more probative of commercial reasonableness than WCX's did not create an irrebuttable presumption.

Finally, turning to the full weight of the evidence presented before the Commission and properly before this court, we cannot say that the Commission's decision was not supported by substantial evidence. The evidence of AT&T's other data roaming rates constituted evidence that "a reasonable mind might accept as adequate" to justify the Commission's conclusion that AT&T's proposed rates were commercially reasonable. *Elgin Nursing*, 718 F.3d at 495 (quoting *Hames*, 707 F.2d at 164). The Commission's determination that AT&T's proposed rates were commercially reasonable was therefore not arbitrary and capricious.

Accordingly, we DENY WCX's petition for review of the Commission's order.

JENNIFER WALKER ELROD, Circuit Judge, concurring in the judgment:

I concur in the judgment. The Data Roaming Rule applies to this agreement. I write separately to reach this conclusion not through the labyrinth of *Auer* deference, but through the straightforward application of the regulation's text. We defer to an agency's interpretation of its own regulation only when the regulation is "ambiguous." *Tex. Clinical Labs v. Sebelius*, 612 F.3d 771, 777 (5th Cir. 2010) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). But the regulation at issue here is not. The Automatic Roaming Rule imposes duties only on a "host carrier subject to [subsection] (a)(2)." 47 C.F.R. § 20.12(d). To fall within the scope of subsection (a)(2), the host must be a "CMRS carrier[]" that "offer[s] real-time, two-way switched voice or data service that is interconnected with the public switched network." *Id.* § 20.12(a)(2). By definition, CMDS, the service that AT&T offered to WCX, is "not interconnected with the public switched network." *Id.* § 20.3. When, as here, a carrier provides commercial mobile data services to a customer, it is (unsurprisingly) a "provider[] of commercial mobile data services." *Id.* § 20.12(a)(3). That means that the Data Roaming Rule applies. *Id.*

Moreover, "[w]hen presented with two plausible readings of a regulatory text," we "prefer[] the reading that does not render portions of that text superfluous." *Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380, 399 (5th Cir. 2014). WCX's interpretation would render the Data Roaming Rule superfluous. If a provider of CMDS became subject to the CMRS roaming rule simply by providing CMRS service to the public, there would be no reason for a separate Data Roaming Rule for such carriers. WCX does not identify any data roaming request that it or another wireless provider could make to AT&T or another host that would be subject to the data roaming rule.